IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL D. WRIGHT, #353261
      Plaintiff              :

      v.                        :   CIVIL ACTION NO. PWG-13-2878

BOBBY P. SHEARIN, WARDEN   :
GREGORY FLURY, PHYSICIAN
  ASSISTANT                 :
KRISTIE CORTEZ, REGISTERED NURSE
RICHARD RODERICK, CASE MANAGER:
CORRECTIONAL OFFICER
  HENDERSON                 :
SERGEANT HARRIS[1]
JAMES E. BENNETT            :
      Defendants

**MEMORANDUM OPINION**

Invoking the civil rights statute, 42 U.S.C. § 1983, Michael D. Wright ("Wright") is suing Bobby Shearin, former Warden of North Branch Correctional Institution ("NBCI"), Case Manager Richard Roderick, and Correctional Officer Henderson (the "correctional defendants"), as well as Registered Nurse Kristie Cortez and Physician Assistant Gregory Flury (the "medical defendants").[2] (ECF 1). Defendants have filed motions to dismiss or, in the alternative for summary judgment with verified exhibits (ECF 14, 15, 20, 23, 29 and 30); Wright's opposition

---

[1] The Clerk shall amend the docket to reflect Sergeant Harris as a party defendant. Harris, who allegedly shared responsibility for confiscating Wright's religious books, has not been served with summons and the complaint. The facts of this case demonstrate that had he been served, Harris would be entitled to dismissal of the claim against him.

[2] Maryland prisoner James E. Bennett, #123281, Wright's former cellmate, is not a party to this case. His name appears on the docket because he requested that Wright be given an extension of time to file opposition responses after Bennett and Wright were assigned separate cells, thus impeding Bennett's ability to assist Wright with this litigation. (ECF 26). Unless a prisoner is utterly unable to put forth the factual basis for his claim, he is not entitled to assistance from a fellow prisoner. *See Arey v. Peyton*, 378 F.2d 930, 931 (4th Cir. 1967). The facts have been set forth here in detail, and various motions have been filed by – or on behalf of -- Wright. Bennett's request that he be formally recognized to act as Wright's jailhouse lawyer is denied.

response (ECF 32);[3] and the medical defendants' reply thereto. (ECF 34). No hearing is needed to resolve the issues. *See* Local Rule 106.5 (D. Md. 2014).

## PLAINTIFF'S ALLEGATIONS

Wright alleges (1) he is in physical danger from a known enemy; (2) he has been denied appropriate medical treatment for an injury inflicted by that enemy; and (3) his religious books were wrongfully confiscated in retaliation after he voiced the first two problems to corrections officials.

Specifically, Wright claims he was deprived of his Eighth Amendment right to protection from violence when the correctional defendants at NBCI failed to comply with a Circuit Court order requiring him to be kept separate from co-defendant Edmonds, who attacked him on July 20, 2013. He further states that: Warden Shearin made false statements in his response to Wright's Administrative Remedy Procedure ("ARP") complaint (ECF 10) and has retaliated against him by acting in concert with Officer Bennett and Sergeant Harris to deny him access to religious books he had purchased using money from his prison account. (ECF 13); Officer Henderson later placed him in a cell near his attacker (ECF 6 and 7); and Case Manager Roderick disregarded base file information stating that Wright and his co-defendant were enemies. (ECF 6 and 7). Wright also claims that the medical defendants failed to provide adequate medical care for an eye injury he sustained in the attack. He seeks money damages of $2,000,000 plus court costs. (ECF 1, p. 3).

---

[3] Wright has filed a "Supplemental Complaint" (ECF 13) claiming that Warden Shearin and Property Officers Harris and Bennett retaliated against him for filing this case by confiscating religious books that were on the allowable property list. Attachments to the pleading include correspondence relevant to the core claim in this case, to wit, when prison personnel became aware that Wright and his co-defendant were enemies. These attachments shall be considered as exhibits in support of Wright's opposition response. *See* ECF 13-2 (October 30, 2013 correspondence from the Honorable Beverly J. Woodard, Circuit Court for Prince George's County, Maryland).

## DEFENDANTS' RESPONSES

### A. Correctional Defendants

1. Warden Shearin

Correctional defendant Bobby Shearin, Warden of NBCI at the time of the incident alleged, asserts that prior to the July 20, 2013 incident, he had no personal knowledge that a court order had been entered to keep Wright and Edmonds apart. Shearin further states that he played no role in providing medical treatment to prisoners. Shearin contends that he dismissed Wright's ARP complaining that his book order was mishandled and advised Wright that pursuant to Division of Correction Directives ("DCD"), he did not receive the books because they arrived while he was on disciplinary segregation, but could request a refund from the company from which the books had been ordered. (ECF 14-11, p. 8). Shearin seeks dismissal of the claims against him or entry of summary judgment in his favor. (ECF 14).

In support of his dispositive motion, Shearin has submitted his declaration in which he attests that he defers to the expertise of the medical authorities with regard to complaints involving prisoner medical care. (ECF 28-11).[4] Shearin argues that he did not consciously disregard the risk of harm to which Wright was subjected and did not subject him to retaliation. Shearin further contends that Wright did not properly exhaust Administrative Remedy Procedure ("ARP") complaints concerning his claims as required under the Prison Litigation Reform Act ("PLRA"); that he cannot be held liable as a supervisor for alleged wrongdoing on the part of others; and that he is entitled to qualified immunity from suit. (ECF 14).

2. Defendants Roderick and Henderson

Wright alleges Case Management Supervisor Roderick subjected him to violence by disregarding information concerning his enemies located in his base file. (ECF 6, p. 3 and 7, pp.

---

[4] This memorandum opinion references pagination reflected in the court electronic docketing system.

3

2–3). He further claims that Officer Henderson ignored his fears after the attack occurred, instead telling him that "prison is hard." (ECF 6, p. 3–4 and 7, p. 3).

The correctional defendants have submitted records to support their arguments. Wright was committed to the custody of the DOC in Case Number CT080453A. (ECF 14-4, Circuit Order CT080453A; ECF 14-5, Declaration of Randy Durst, ¶ 3). The October 6, 2008, commitment order stated "[Wright] shall be kept separate and apart from the co-defendant Jonathan Edmonds." (ECF 14-4, p. 1).

Wright entered the Maryland Reception, Diagnostic, and Classification Center ("MRDCC") on October 7, 2008. (ECF 14-5, ¶ 3). The Initial Security Classification conducted at MRDCC lists no enemies on the security classification form. (*Id.*).

On April 20, 2009, Wright was transferred from MRDCC to Western Correctional Institution (WCI), where he remained until September 1, 2009. (*Id.* ¶ 4). While at WCI, a case management assignment was conducted and Wright received institutional orientation information within days of his arrival at WCI. Case Management notes do not indicate that Wright identified any known enemies. (*Id.*).

On September 1, 2009, Wright was transferred to NBCI. *Id.* ¶ 5. The following day, he received Institutional orientation, including a handbook which explained rules, directives and disciplinary procedures. Institutional records do not reflect that Wright mentioned any enemy situations. (*Id.*). Randy Durst, a case management manager, conducted an initial assignment review at NBCI on September 9, 2009, at which Wright indicated he had no known enemies. (*Id.*, ¶6). Wright was assigned to a general population housing unit. *Id.*

Prison records reflect that Wright had face-to-face interviews with prison staff on at least nine occasions prior to the altercation on July 20, 2013, while he was housed at WCI and NBCI, including orientations, initial assignments, reassignments, and annual security reviews. (*Id.* ¶ 7). Defendants contend that Wright never made any statement concerning a possible enemy situation or indicated that his commitment records required him to be kept separate from Jonathan Edmonds prior to the July 20, 2013 incident. (*Id.*).

Security reclassification reviews, during which the OBSCIS[5] enemies list is reviewed, are conducted annually. (*Id.,* ¶8). Plaintiff had yearly reviews completed in October of 2009, 2010, 2011 and 2012. (*Id.*). On December 30, 2009, inmate Vickers, #3256340 was added to the OBSCIS Maintain Enemies List after he and Wright had a fight. The yearly reviews conducted in 2010, 2011, and 2012 listed only Vickers on the enemies list. (*Id.*).

Wright's co-defendant, Edmonds, entered MRDCC on October 7, 2008. (ECF 29-6, OBSCIS Offender Traffic History, Edmonds). He was transferred to NBCI on October 21, 2008. (*Id.*). Between September 25, 2011 and July 20, 2013, Wright was housed in housing unit 2, A Tier, Cell 30 at NBCI. (ECF 29-3; ECF 29-5, ¶9). Between June 24, 2013 and July 20, 2013, Edmonds was housed in housing unit 2, B Tier, Cell 40. (ECF 29-5, ¶9; ECF 29-6). Neither man identified the other as an enemy as of July 20, 2013. (ECF 29-5, ¶9).

On July 20, 2013, the two fought. Wright was injured and taken to the medical department for treatment. Both were charged with infractions. Defendant Henderson served Wright with a notice of discipline hearing form on the evening of July 20, 2013, after Wright had been moved to Cell HU1-B-11. (ECF 9-8, Declaration of Correctional Officer Henderson and attachments).

---

[5] OBSCIS is Maryland's prisoner database, known as the Offender Based State Correctional Information System.

Wright was found guilty of violating Rule 102 (assault upon an inmate) and sanctioned to 120 days disciplinary segregation. (*Id.*). The Hearing Officer found that Wright's actions went far beyond self-defense. (ECF 29-7, Hearing Officer's Report).

After the July 20, 2013 incident, Wright and Edmonds were housed in separate cells in the Special Confinement Housing Unit. (ECF 29-5, ¶10; ECF 29-3; ECF 29-9, Declaration of Sean McKenzie and diagram; ECF 29-6). On November 15, 2013, Edmonds was transferred to another institution. (ECF 29-6). Those housed in the special confinement housing unit are cuffed and escorted by correctional officers when taken from their cells for any activities. (ECF 29-5). There were no physical incidents between Edmonds and Wright while they were both housed on the special confinement housing unit. (*Id.*). Defendant Roderick avers that he relies on case managers and correctional officers to determine appropriate housing assignments, and was not aware of the court order to keep Wright and Edmonds separated prior to the July 20, 2013 incident. (ECF 29-10, Declaration of Richard Roderick).

On August 28, 2013, Wright filed ARP NBCI 2446-13 complaining that he was housed at NBCI in violation of a court order and was attacked by Edmonds. (ECF 29-11, NBCI 2446-13 records). Defendant Shearin dismissed the ARP. (*Id.*). Wright appealed the decision to the Inmate Grievance Office ("IGO"). On November 19, 2013, Scott Oakley, the Executive Director of the IGO, dismissed the grievance without prejudice on November 19, 2013, for failure to state a claim, finding that Wright already had filed the instant action in federal court. (ECF 29-13, Declaration of Scott Oakley, dated December 2, 2013).[6]

---

[6] The correctional defendants seek dismissal of the case based on Wright's failure to complete his administrative remedies prior to filing suit. The undersigned notes that during the relevant period, NBCI was under lockdown. Without inquiring further as to the availability of the ARP process during the lockdown, I decline to base review of this case on the affirmative defense concerning failure to exhaust under the PLRA. *See Jones v. Bock*, 549 U.S. 199, 216 (2007) ("[F]ailure to exhaust is an affirmative defense under the PLRA.").

### B.   Medical Defendants

Wright alleges despite many sick call requests, he was not provided treatment for his eye injury until a month after the altercation. He claims that the treatment was ineffective because of a prison lockdown which prevented medical personnel, including defendant Cortez, from entering his cell, requiring them to treat him through the window of his cell door, and states he never received the eye drops prescribed by defendant Flury. Wright claims that as a result of his deficient medical treatment, he has suffered further eye injury and unnecessary pain. (ECF 1, pp. 3, 6-9; ECF 6, p. 2).

Medical records indicate that Wright was treated by Registered Nurse Carla Buck on the day of the assault, July 20, 2013. (ECF 20-4, pp. 8-9, 24). Buck noted that Wright was alert and oriented and had dried blood on his nostrils and a swelling around his left eye. Both pupils were equal, round and reactive to light, and Wright denied blurred vision or other injuries. He was given Ibuprofen for pain and swelling and told to place a sick call request if further evaluation was necessary. *Id.*

On August 27, 2013, Wright filed a sick call request stating that his right eye was injured as a result of an attack. (ECF 20-4, p. 24). He was seen the next day by Registered Nurse Krista Swann, who completed a limited assessment through Wright's cell door window because the prison was on lockdown. (*Id.*, p. 10). The eye was swollen and dried yellow drainage near the eye was observed. Swann referred Wright to a provider for further evaluation. (*Id.*)

On September 3, 2013, Wright was seen by defendant Flury for complaints of right eye pain and drainage that had not resolved since the July 20, 2013 altercation. (*Id.*, p.

11). He complained of transient blurred vision, and during an eye exam, refused to read the eye chart, stating "I can't even read that 'E' up there." Flury found Wright's general eye condition to be normal, with extraocular movements intact and his pupils equally round and reactive to light. Flury noted no redness or eye drainage, and referred Wright to an optometrist. (*Id.*). Wright saw medical personnel for an unrelated medical concern on two occasions during September of 2013, and did not complain of eye problems during those visits. (*Id.*, pp. 16–17, 26).

On October 23, 2013, Wright was examined by an optometrist. He reported pain in his right eye since being "butt[ed]." Wright's eye health was good, but he was prescribed glasses for compound myopic astigmatism ("CMA") not caused by the injury sustained in the fight. (*Id.*, pp. 21–22).

On November 6, 2013, defendant Cortez examined Wright for eye pain and irritation. (*Id.*, pp. 18–20). Wright's eyes appeared normal, his pupils were equal and reactive, and no vision changes were found. Cortex prescribed "artificial tears" to relieve dryness and itching. (*Id.*). Wright received the drops on November 9, 2013, (*Id.*, p. 30).

## STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1) (A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251 (1986) (citing cases). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* at 252.

Wright is proceeding pro se and his complaint is to be construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, liberal construction does not absolve Wright from pleading a plausible claim. *See Holsey v. Collins*, 90 F.R.D. 122, 128 (D. Md. 1981) (citing *Inmates v. Owens*, 561 F.2d 560, 562–63 (4th Cir. 1977)).

## DISCUSSION

Wright claims the medical defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. As interpreted by the Supreme Court, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). In the context of denial of medical care, an Eighth Amendment violation arises when the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential

to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995), quoting *Farmer*, 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met. *Id.* at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge). Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim for deliberate indifference. *See Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975) (concluding that, where a prisoner was under constant medical supervision, his claims did not rise to the level of deliberate indifference).

Wright appears to be displeased with the cursory examinations provided by the named medical defendants during a period when the prison was on lockdown, as well as a delay in the delivery of eye drops. The medical records do not demonstrate that Wright sustained a serious eye injury as a result of the altercation with Edmonds, or that he has ongoing vision problems resulting from the incident. It is unfortunate that medical care during the month following the incident was limited by the lockdown, and that defendant Cortez had limited ability to assist Wright except to view his eye through the cell window. While such treatment was less than reassuring to Wright, he did not sustain actual harm as a result. Thus, his Eight Amendment rights were not violated and the medical defendants are entitled to summary judgment.

Wright's claims against defendant Shearin fare no better. In order to survive summary judgment for a claim under 42 U.S.C. § 1983, a plaintiff must "'affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights.'" *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). This showing is necessary because the doctrine of respondeat superior generally is inapplicable to § 1983 actions. *See Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Vinnedge v. Gibbs*, 550 F.2d at 927–99; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, Wright must demonstrate that a defendant had "personal knowledge of and involvement" in the alleged constitutional deprivation to establish liability under § 1983. *Id.*

Liability of supervisory officials is not based on ordinary principles of respondeat superior, but rather is premised on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Section 1983 liability on the part of a supervisor requires a showing that:1) the supervisory defendant failed promptly to provide an inmate with needed medical care, 2) the supervisory defendant deliberately interfered with the medical provider's performance, or 3) the supervisory defendant tacitly authorized or was indifferent to the medical provider's constitutional violations. *See Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).
Wright seeks to hold Shearin responsible for the attack and his subsequent assignment to a restricted tier. Aside from involvement in reviewing ARP complaints, Wright does not allege any personal involvement by Shearin in the incidents presented in his complaint. This is the very

essence of the doctrine of respondeat superior, which has no place in 1983 litigation.[7]

Wright's claim that Shearin failed to ensure the delivery of appropriate medical care likewise fails. As a nonmedical correctional supervisor, Shearin was entitled to rely on the medical judgment and expertise of prison physicians and medical staff concerning the course of treatment necessary for inmates. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (stating supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel).

Wright's allegation that Shearin, Bennett and Harris confiscated his religious books in retaliation for his complaints concerning the July 20, 2013 incident also fails. In order to prevail on a claim of retaliation, Wright "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).[8] This Circuit recognizes that:

> [r]etaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

---

[7] Stated another way, Shearin's general administrative responsibilities are insufficient to confer supervisory culpability.

[8] It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *Compare Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim") and *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) ("'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'") (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

*ACLU of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993). In the prison context, such claims are viewed with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d at 74).

Pursuant to DCD 110-6, prisoners housed on disciplinary segregation are not allowed to receive packages. (ECF 14-5, ¶ 12). On September 27, 2013, a package from Christian Book Distributors addressed to Wright was received in the NBCI property room. At that time, Wright was on disciplinary segregation. (*Id.*, ¶12). The package was returned to the company pursuant to DCD 110-6. (*Id.*). Wright filed ARP No. NBCI 3398-13, complaining that his book order, containing the "KJV Dake Annotated Ref. Bible" and "What every Christian needs to know about the Quran" was mishandled. The ARP was dismissed by Shearin and Wright was told to contact the company for a refund. (*Id.*). On November 21, 2013, the $45.47 paid for the books was returned to Wright's prison account. (*Id.*). Nothing indicates that Wright is unable to reorder the books, provided that he is not on disciplinary segregation status. For these reasons, Shearin, Bennett and Harris are entitled to summary judgment in their favor on Wright's claim for retaliation.[9]

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Wright must establish that the correctional defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987). The courts have long recognized that although prison conditions "may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no

---

[9] Because Shearin cannot be held liable, his argument concerning qualified immunity is not addressed here.

legitimate penologicial objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted). Nonetheless, a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, *see also Rich v. Bruce*, 129 F. 3d 336, 339-40 (4th Cir. 1997).

It is unfortunate that the commitment paperwork dating from 2008, stating that Wright and Edmonds were to be kept apart, did not trigger MRDCC personnel to make the necessary entries in the OBSCIS database, and that the error was not corrected until Wright and Edmonds came to blows on July 20, 2013. Nothing suggests, however, that Wright made prison personnel aware of the discord between him and his co-defendant, even after Edmonds' June 24, 2013 transfer to NBCI, where he was housed one tier away from Wright. Having failed to notify defendants of a specific known risk of harm, Wright has failed to state an Eight Amendment claim for the initial oversight in noting that Edmonds was his enemy.

## CONCLUSION

There is no disputed material fact on which Wright could persuade a jury to find that defendants' conduct violated his constitutional rights.[10] For the reasons set forth above, defendants' motions for summary judgment will be granted. A separate order follows.

September 16, 2014  
Date

/s/  
Paul W. Grimm  
United States District Judge

---

[10] To the extent that the correctional defendants' failure to keep Wright from Edmonds might constitute negligence, the undersigned declines to exercise supplemental jurisdiction and consider this state tort claim.